*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 15-CF-820, 15-CF-834, & 16-CO-1049

CHRISTOPHER LUCAS and CHRISTINA LUCAS, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court of the
District of Columbia
(CF2-20980-13 & CF3-6253-14)

(Hon. Yvonne M. Williams, Trial Judge)

(Argued September 19, 2018                    Decided October 22, 2020)

*Barbara E. Kittay* for appellant Christopher Lucas.

*Joshua Deahl*, Public Defender Service at the time, with whom *Samia Fam*, Public Defender Service, *Thomas D. Engle*,[*] and *Sharon L. Burka*, were on the briefs, for appellant Christina Lucas.

*Lauren R. Bates*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the reply brief was filed, *Channing D. Phillips*, United States Attorney at the time the initial brief was filed, and *Elizabeth Trosman*,

---

[*] Following initial briefing, Thomas D. Engle withdrew as counsel for Christina Lucas. The Public Defender Service (PDS) thereafter entered an appearance for Christina Lucas, filed a supplemental brief on Christina Lucas's behalf, and represented her at oral argument. We considered the briefs of both PDS and Mr. Engle.

*Nicholas P. Coleman*, and *Veronica Jennings*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH, *Associate Judge*, and FISHER, *Senior Judge*.[*]

Opinion for the court by *Chief Judge* BLACKBURNE-RIGSBY.

Concurring opinion by *Senior Judge* FISHER at page 53.

Dissenting opinion by *Associate Judge* BECKWITH at page 54.

BLACKBURNE-RIGSBY, *Chief Judge*: Following a joint jury trial, nineteen-year-old twins appellants Christopher and Christina Lucas were found guilty of aggravated assault while armed with a "[b]ias-related" penalty enhancement on the basis of sexual orientation in connection with an assault on victim Jaye Davis.[1] Christopher Lucas was also found guilty of simple assault on victim Ashley Coleman.[2] They appeal their convictions.

Appellants raise several issues on appeal, two of which – the trial court's response to a jury question and the sufficiency of the evidence – require this court

---

[*] Judge Fisher was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on August 23, 2020.

[1] D.C. Code §§ 22-404.01, -4502 (2012 Repl. & 2020 Supp.); D.C. Code §§ 22-3701(1), -3703 (2012 Repl.).

[2] D.C. Code § 22-404 (2012 Repl.).

to interpret the Bias-Related Crime Act of 1989, D.C. Code § 22-3701(1) (the "Bias-Related Crime Act"). The Act states, in relevant part, that a "'[b]ias-related crime' means a designated act that demonstrates an accused's prejudice based on the actual or perceived . . . sexual orientation . . . of a victim of the" crime. *Id.* We are tasked with determining the role prejudice must play in motivating a crime before triggering the enhanced criminal penalties the Bias-Related Crime Act evokes.

Appellants contend that a proper reading of the statute, based on its plain language and applicable constitutional principles, requires but-for causation, meaning the jury must determine whether appellants would not have attacked Jaye Davis "but for" their prejudice against him based on his sexual orientation. *See Burrage v. United States*, 571 U.S. 204, 210-211 (2014). Analyzed pursuant to this standard, they contend, the evidence was insufficient for the jury to apply the bias enhancement because the evidence shows various motivations for appellants' attack on Jaye Davis, but does not show that they attacked him because of their prejudice against him based on his sexual orientation. The government maintains that any argument related to the correct interpretation of § 22-3701(1) of the statute is waived because appellants failed to request a jury instruction requiring but-for causation at any point during trial. Assuming the issue is appropriately preserved, however, the government argues that a lesser standard should apply. Further, the government

contends, even if but-for causation is required, the trial court appropriately communicated that standard to the jury. The government urges us to affirm appellants' convictions because, it argues, there was sufficient evidence to support the jury's findings under either standard.

We hold that the Bias-Related Crime Act requires but-for causation, such that the government must prove that the appellants assaulted Jaye Davis because of their prejudice against him based on his sexual orientation. The trial court appropriately instructed the jury on how to apply the Bias-Related Crime Act. Moreover, in applying but-for causation, we conclude that the evidence was sufficient for the jury to find that appellants would not have attacked Jaye Davis absent their prejudice against him based on his sexual orientation. Appellants' arguments as to the causation standard under the Bias-Related Crime Act, however, do not affect their underlying simple and aggravated assault convictions. Finding no abuse of discretion on appellants' remaining challenges to the evidence supporting those assault convictions, discussed further below, we affirm.

## I. Factual and Procedural Background

During the evening of October 18 and early morning hours of October 19, 2013, appellants assaulted Jaye Davis after a family gathering hosted at the home of his uncle, Leo Davis, in Northwest Washington, D.C.[3] That evening, Jaye arrived at Leo's home between 8:30 and 9:00 p.m. From the moment he arrived at the gathering until he left, Jaye was the subject of homophobic taunts, including "gay this and gay that" comments in tones of "anger and disgust" and being called "f[*]ggot a[*]s mother f[*]cker." When Jaye arrived at the party, appellants Christopher and Christina – who were at the gathering – stared, pointed at Jaye, and said, "Who is this gay motherf[*]cker?" Appellants both gave Jaye a disgusted look. Jaye openly identifies as gay, and his cousin Ashley Coleman, also present at Leo's house, testified that he "walks . . . girly," "talks girly," and "acts" in a way that exhibits effeminate stereotypes of gay men.

At one point in the evening, Jaye became involved in an argument with some individuals, including appellants.[4] Ashley could not remember with whom Jaye was arguing, but testified that Jaye "was going back and forth. He was cursing . . . . he was being loud, but he was saying things in defense of himself . . . . It was an

---

[3] The individuals in this opinion will be referred to by their first names because many share last names.

[4] The argument allegedly arose out of an altercation between Ashley and Annie Elder, Christopher's girlfriend.

argument of words. It was a fight with words." The situation escalated, causing another individual, Andre Holland, to intervene on Christina's behalf. Holland testified that Jaye and Leo were trying to push Christina, prompting Holland to fight back against both. The police arrived before the argument got out of hand and instructed the crowd to disperse.

Jaye, his cousin Ashley, and his mother Alicia Coleman left the party at around 12:20 a.m. and walked to the corner of Sherman Avenue and Harvard Street Northwest to find a cab; at that intersection, they noticed that a large group had followed them. Appellants led the group, saying, "[T]here go that f[*]ggot mother f[*]cker right there." Ashley and Alicia testified that the group, numbering approximately ten people and including appellants Christopher and Christina, attacked Jaye, as well as Ashley and Alicia. During the fight, Christopher hit Ashley in the head and knocked her to the ground. At one point, Jaye was grabbed by his throat, pulled onto the ground, and dragged along the sidewalk. Both Christopher and Christina targeted Jaye and stomped on his face, all while yelling remarks like "f[*]ggot mother[*]cker." Christina then took a razor-like object from her pocket, kneeled next to Jaye, and cut open his face along the left eye. Jaye was left bloodied and unconscious, and the group – including appellants – ran off. Police officers

patrolling the area heard loud screaming, quickly arrived at the scene, and observed Jaye "bleeding in the face," in pain, and being cradled in Alicia's arms.

Jaye testified that he lost consciousness during the assault and did not regain consciousness until later in an ambulance.  Upon arrival at the hospital, Jaye rated his pain as "severe" and testified that his pain was "like 100" on a scale of one to ten.  Dr. Ashley Humphries, the trauma surgeon who treated Jaye, testified that he had "several obvious injuries to his face" upon his arrival.  Jaye received stitches for two face lacerations next to and beneath his left eye, one of which was "fairly jagged in appearance."  A CT scan and X-rays revealed a sinus fracture and a cheekbone fracture.  Jaye also suffered swelling to his wrist, lips, and eyes, and was left with an "ugly" black scar under his eye.  Jaye could not recall who among the group attacked him first, but remembered hearing "[t]he same words" during the attack that he had heard when he first arrived at the party: "[t]his f[*]ggot a[*]s mother f[*]cker, f[*]ggot a[*]s mother f[*]cker."

At trial, appellants presented evidence that they were not present at the time of the assault.  The jury did not credit their testimony, convicting them of aggravated assault while armed.  As to the bias enhancement, appellants argued that any assault on Jaye occurred because of other motivations, such as the earlier altercation at Leo's

house, rather than Jaye's sexual orientation. The jury returned separate verdicts finding that each appellant committed the crime because of Jaye's actual or perceived sexual orientation. Christopher was also convicted of simple assault on Ashley.

On appeal, appellants raise legal arguments involving the jury instruction under the Bias-Related Crime Act and a related jury note, arguing that the trial court failed to instruct the jury that the penalty enhancement requires but-for causation. Under a but-for causation standard, appellants argue that the evidence was insufficient to find that they attacked Jaye because of prejudice against him based on his sexual orientation. Appellants then raise three challenges related to the trial court's decisions to (1) limit cross-examination related to the defense's theory of the case; (2) permit Jaye's mother to testify about his condition after he was attacked, which, appellants argue, elicited an improper emotional response from the jury; and (3) excuse Jaye after he testified in the government's case-in-chief.

## II.    Causation and the Bias-Related Crime Act

In deciding this appeal, we must first determine the causation standard under the bias enhancement statute. We review issues of statutory interpretation de novo.

*Aboye v. United States*, 121 A.3d 1245, 1249 (D.C. 2015).  Questions of statutory interpretation begin with the plain language of the statute, and we construe words according to their ordinary meaning.  *See Clyburn v. United States*, 48 A.3d 147, 151 (D.C. 2012).  The words of a statute must be read "in light of the statute taken as a whole" and "are to be given a sensible construction, [] one that would not work an obvious injustice."  *Id.* (quoting *Columbia Plaza Tenants' Ass'n v. Columbia Plaza Ltd. P'ship*, 869 A.2d 329, 332 (D.C. 2005)).  When appropriate, we also consult a statute's legislative history.  *Id.*

## A.     Statutory Text and Our Jurisprudence

The Bias-Related Crime Act provides enhanced criminal penalties for persons who commit bias-related crimes, with the opportunity for appropriate civil relief for their victims.  *See* D.C. Law 8-121, 37 DCR 27 (May 8, 1990).  Section 22-3701(1) of the D.C. Code defines a "[b]ias-related crime" as

> a designated act that demonstrates an accused's prejudice based on the actual or perceived race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibility, homelessness, physical disability, matriculation, or political affiliation of a victim of the subject designated act.

*See also* D.C. Code § 22-3704(a) (2012 Repl.) (providing civil relief to those injured "as a result of an intentional act that demonstrates an accused's prejudice based on" one of the same protected characteristics).  Simply put, the statute authorizes a penalty enhancement if an individual commits a criminal act that "demonstrates . . . prejudice" based on a victim's protected characteristic.  *Id.* § 22-3701(1).[5]

This court has only had one other occasion to review the statutory definition of "bias-related crime," and only did so on limited, plain error review.  In *Shepherd v. United States*, 905 A.2d 260 (D.C. 2006), we recognized that the statutory definition of "bias-related crime" – that a criminal act "demonstrates an accused's prejudice based on" a protected characteristic – might, if applied literally, punish "only the fact of being prejudiced, without the constitutionally-required nexus between that prejudice and the proscribed conduct."  *Id.* at 262 (citing *R.A.V. v. City*

---

[5] The statute defines a "designated act" as

> a criminal act, including arson, assault, burglary, injury to property, kidnapping, manslaughter, murder, rape, robbery, theft, or unlawful entry, and attempting, aiding, abetting, advising, inciting, conniving, or conspiring to commit arson, assault, burglary, injury to property, kidnapping, manslaughter, murder, rape, robbery, theft, or unlawful entry.

D.C. Code § 22-3701(2).  In *Aboye*, we held that the definition of "designated act" in § 22-3701(2) was not limited to the crimes delineated therein, but rather included "any criminal act under District of Columbia law."  121 A.3d at 1249.

*of St. Paul*, 505 U.S. 377 (1992)). Because the appellant in *Shepherd* raised the constitutional issue for the first time on appeal, however, we subjected his argument to plain error review and did not "review[] the constitutionality of the statutory definition of a 'bias-related crime.'" *Id.* 262. We found that appellant's conviction did not present this constitutional issue because the trial court "implicitly applied the statute as requiring a clear nexus between the bias identified in the statute and the assault"; therefore, it was "appellant's assaultive conduct motivated by bias, not his homophobic prejudice as such, that was subject to criminal sanction." *Id.* at 262-63. The court in *Shepherd* did not attempt to identify the causation standard required by the Bias-Related Crime Act, but merely found no plain error in the trial court's decision – basing the penalty enhancement on a finding of a nexus between the appellant's bias and the assault – thereby sidestepping a constitutional issue.

### B.    Constitutional Concerns

Understanding what causation is required for an act to "demonstrate[] prejudice" requires us to determine whether the Bias-Related Crime Act punishes only the fact of being prejudiced, a potentially impermissible infringement on an individual's First Amendment right to expression, or whether it punishes conduct with a sufficient nexus to the prohibited prejudice. As the parties note, the District's

Bias-Related Crime Act is different from most states' hate-crime laws, in that the "majority of [state] statutes define a hate crime as one in which the actor committed the offense 'because of,' 'by reason of,' or 'on account of' another person's race or other protected status." Zachary J. Wolfe, *Hate Crimes Law* § 3:8 (June 2019) (surveying statutes). Instead, the "demonstrates . . . prejudice" language of the District of Columbia's Act does not expressly require a causal connection between bias and the criminal act and would appear to punish "the fact of being prejudiced," *Shepherd*, 905 A.2d at 262-63, thus raising constitutional concerns. *See R.A.V.*, 505 U.S. at 391 (finding hate crime statute that prohibits speakers from expressing views on disfavored subjects places an unconstitutional limit on freedom of expression).

In constructing a constitutionally coherent understanding of the Bias-Related Crime Act, we take guidance from *Wisconsin v. Mitchell*, 508 U.S. 476 (1993), in which the Supreme Court upheld the constitutionality of a Wisconsin hate crime penalty enhancement statute that prohibited crimes where the perpetrator "intentionally selects the person . . . because of" the person's protected characteristic. *Id.* at 479-80. Because the statute punished bias-motivated criminal conduct (rather than explicitly prohibiting expression, i.e., speech or messages), the Court concluded that "the statute in th[e] case [was] aimed at conduct unprotected by the First Amendment." *Id.* at 487. Guided by this analysis, we interpret the Bias-Related

Crime Act in a way that only punishes analogous conduct, i.e., that which is not protected by the First Amendment.

We also look to *State v. Stalder*, 630 So. 2d 1072 (Fla. 1994), in which the Florida Supreme Court reviewed the constitutionality of Florida's hate crime statute, which is one of the only other state statutes with language similar to ours. The Florida statute, entitled "Evidencing prejudice while committing offense," provides enhanced penalties if commission of a crime "evidences prejudice based on" the victim's protected characteristic. Fla. Stat. § 775.085 (2016). The court accorded "plain meaning to the statute's text and title," finding that it "punishes all who 'evidence,' or demonstrate, prejudice in the commission of a crime." *Stalder*, 630 So. 2d at 1074. This plain meaning, the court recognized, "proscribes bias-evidencing crimes," which "embrac[es] two broad classes of offenses": first, "offenses committed because of prejudice," and second, "offenses committed for some reason other than prejudice but that nevertheless show bias in their commission."[6] *Id.* at 1076. The court reasoned that the statute could not be read to apply to the second class because the expression of bias "is related to the underlying

_____

[6] The court offered the following example to demonstrate this second class of offense: "A beats B because of jealousy, but in the course of the battery calls B a racially derogatory term." *Stalder*, 630 So. 2d at 1076. The fact that the racially derogatory term intersects with the assault is "mere temporal coincidence." *Id.*

crime in only the most tangential way": they "share the same temporal framework, nothing more." *Id.* As such, the proscribed conduct is "pure expression" and, pursuant to the principles articulated by the Supreme Court in *R.A.V.*, "cannot be selectively banned." *Id.* Thus, the court read the Florida statute as "embracing only bias-motivated crimes," i.e., the first class of offenses, in which the "targeted activity—the selection of the victim—is an integral part of the underlying crime" and therefore not protected speech at all. *Id.* The court read the Florida statute narrowly, consistent with the statutory language and legislative intent, to save it from unconstitutionality, holding that a bias-motivated crime is "any crime wherein the perpetrator intentionally selects the victim because of the victim's" protected characteristic. *Id.* at 1077.

"[W]e apply the canon of constitutional avoidance, 'an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts.'" *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1236 (D.C. 2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009)). *Mitchell* and *Stalder* lead us to conclude that the Bias-Related Crime Act is constitutional to the extent that it provides an enhanced penalty for bias-motivated crimes, that is, a crime that an individual perpetrates against a victim because of prejudice based on the victim's protected characteristic. While both courts endorsed

an "intentional selection" standard (*Mitchell* by statute and *Stalder* by interpretation[7]), neither defined the constitutional floor of criminal liability pursuant to a hate crime statute under that standard.[8]  Instead, both recognize that the constitutionality of the hate crime statute is premised on punishing conduct causally linked to the individual's bias against a victim because of statutorily defined protected characteristics.

### C. Legislative History

Concluding that the Bias-Related Crime Act only reaches bias-motivated crimes, we must determine its causation standard.  Because of the lack of clarity in

---

[7]  After *Stalder*, a Florida intermediate court analyzed the causation standard applicable to Florida's "evidencing prejudice" statute – which the court in *Stalder* interpreted as requiring that the "perpetrator intentionally selects the victim because of the victim's" protected characteristic, 630 So. 2d at 1077 – and held that "[t]he essence of criminality under section 775.085 is that prejudice be a significant factor in bringing about the commission of the underlying crime, i.e., but for the racial enmity, the underlying crime would not have occurred." *State v. Hart*, 677 So. 2d 385, 387 (Fla. Dist. Ct. App. 1996).  The Florida Supreme Court has not since weighed in on the statute's causation standard.

[8]  For example, at least one court has held that an "intentional selection" standard under the sentencing enhancement of the federal hate crime statute is met by a "substantial motivating factor" standard, *see United States v. Smith*, 365 F. App'x 781, 788 (9th Cir. 2010), though it remains unclear whether an "intentional selection" standard requires anything more than but-for causation.  See *supra* n.7.

the statutory language of "demonstrates . . . prejudice," we turn to legislative history to evaluate whether the Council of the District of Columbia (the "Council") expressed its intent on this question. *Clyburn*, 48 A.3d at 151. The Judiciary Committee of the Council, in a report issued prior to enactment, stated that the need for the Bias-Related Crime Act arose from "an alarming increase in crimes motivated by bigotry and prejudice in the District." Report to the Council on Bill 8-168 from the Committee on the Judiciary, at 2 (Oct. 18, 1989).[9] In support of the bill, Inspector David W. Bostrom of the D.C. Metropolitan Police Department (MPD), testifying on behalf of the executive branch, stated that "[i]t is our understanding that the intent of [the criminal provisions] of this Bill is to enhance the criminal penalties for a crime when the crime is committed *because of* prejudice based upon the victim's" protected characteristic. *Id.* at Attachment III, p. 1 (emphasis added). Inspector Bostrom advocated against then-proposed language that defined a "[b]ias-related crime" as a "designated criminal act 'that *demonstrates*

---

[9] We note with concern that the number of hate crimes in the District has only risen since the passage of the Bias-Related Crime Act (which we acknowledge may be a result of increased reporting). As reported by the Metropolitan Police Department (MPD), the number of bias-related crimes reached a high of 205 offenses in 2018 (dropping slightly lower to 203 in 2019) from a low of 38 in 2008. *See* MPD, *Bias-Related Crimes (Hate Crimes Data)* (last visited June 23, 2020), https://MPDC.dc.gov/node/208722 https://perma.cc/5XJK-GQAW; MPD, *Metropolitan Police Department Annual Report 2009*, p. 26, *available at* https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/ar_2009_lowres.pdf https://perma.cc/6L9R-UEKM.

*in whole or in part, prejudice based upon*'" a protected characteristic. *Id.* (emphasis added). A later version of the bill deleted the "in whole or in part" language, but defined "[b]ias-related crime" as "a separate element of a designated act that is proven and found to be *based primarily upon*" the protected characteristic. *Id.* at Attachment II, pp. 1-2 (emphasis added). The Council ultimately enacted a definition of "bias-related crime" that excluded both "in whole or in part" and "primarily," passing the current language of "demonstrates . . . prejudice." *See* D.C. Law 8-121, § 2; D.C. Code § 22-3701(1). The legislative history is silent as to this final change, thus providing little insight as to the Council's intent regarding causation and merely evincing the Council's intent to eschew both "in whole or in part" and "primarily" as causation standards. *See also Bostock v. Clayton Cty., Ga.*, No. 17-1618, --- S. Ct. ---, 2020 WL 3146686, at *5 (June 15, 2020) (noting that legislative intent when using words such as "solely" and "primarily" is meant to indicate that a factor be the sole or "main cause").

### D. But-For Causation

Against this backdrop, the government argues that the most natural reading of the statute is that an act demonstrates prejudice if the accused's prejudice is a "contributing cause" of the crime or a motivating factor. Appellants, on the other

hand, argue that but-for causation is required. Both parties rely on the Supreme Court's discussion of the causation standard for criminal liability in *Burrage v. United States*, 571 U.S. 204 (2003), asserting that *Burrage* supports their respective positions.

In *Burrage*, the Supreme Court analyzed the causation standard of the mandatory-minimum sentencing provision of the Controlled Substances Act, which imposes a twenty-year mandatory minimum sentence on any defendant who unlawfully distributes a controlled substance when "death or serious bodily injury results from the use of such substance." *Burrage*, 571 U.S. at 206 (quoting 21 U.S.C. § 841(a)(1), (b)(1)(A)-(C) (2012 ed.)). The Court held that "results from," when given its ordinary meaning, "requires proof that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Id.* at 211 (internal quotation marks and citation omitted). Even if there are multiple contributing factors, one factor can be a but-for cause "so long as the other factors alone would not have [caused the particular result] – if so to speak, it was the straw that broke the camel's back." *Id.* The Court noted that "results from" as employed in § 841(b)(1)(C) is similar in meaning to other causation language such as "based on" and "because of," all of which require but-for causation. *Id.* 212-13. The "but-for requirement is a part of the common understanding of cause." *Id.* at 211; *see also*

*Bostock*, 2020 WL 3146686, at \*4 (describing but-for causation as a "simple" and "traditional" standard).

While the Court in *Burrage* concluded that the Controlled Substances Act required but-for causation, it recognized and discussed the implications of such a standard for purposes of criminal liability. The Court noted that but-for causation is reflected in the Model Penal Code's "traditional understanding" of causal relationship: that "[c]onduct is the cause of a result [when] it is an antecedent but for which the result in question would not have occurred." *Burrage*, 571 U.S. at 211 (quoting Model Penal Code § 2.03(1)(a) (Am. Law Inst. 1985)). This formulation, the Court noted, represents "*the minimum* requirement for a finding of causation when a crime is defined in terms of conduct causing a particular result." *Id.* (quoting Explanatory Note to Model Penal Code § 2.03(1)). In comparison, the Court recognized that a "substantial" or "contributing" factor test – as the government proposed in *Burrage* (and also proposes here) – fails to clarify "how important or how substantial a cause must be" ("50 percent more likely? Fifteen percent? Five? Who knows") and therefore would inject "[u]ncertainty" that "cannot be squared with the beyond-a-reasonable-doubt standard applicable in criminal trials." 571 U.S. at 218. Alternatively, the Court was unwilling to adopt the government's "permissive" standard given the rule of lenity. *Id.* at 216.

Recently in *Fleming v. United States*, this court accepted the analytical framework laid out in *Burrage* and held that a conviction under the District's second-degree murder statute – making it a crime to "kill[] another," i.e., cause death – requires but-for causation. *See* 224 A.3d 213, 217, 219-21 (D.C. 2020) (en banc). Thus, "a defendant cannot be held to have personally caused a death unless an action by the defendant is a but-for cause of the death, i.e., unless it is true that in the absence of the defendant's action the death would not have occurred." *Id.* In describing but-for causation, this court noted that it requires the government to "prove that, if one subtracted the defendant's actions from the chain of events, the decedent would not have been killed." *Id.* at 221. The *Fleming* court endorsed the following language as properly instructing a jury on but-for causation: "the government must prove that the decedent's death occurred as a result of an action by the defendant. In other words, the government must prove that in the absence of an action by the defendant the decedent's death would not have occurred." *Id.* at 229.

Courts interpreting hate crime statutes have adopted a but-for causation standard in order to steer clear of breaching constitutional limits (albeit within the context of statutes requiring that the crime occur "because of" a victim's protected

characteristic). *See, e.g.*, *United States v. Miller*, 767 F.3d 585, 592 (6th Cir. 2014) (interpreting federal hate crime statute using "because of" as requiring but-for causation, in part because any lesser standard "treads uncomfortably close to the line separating constitutional regulation of conduct and unconstitutional regulation of beliefs"); *State v. Hennings*, 791 N.W.2d 828, 834 (Iowa 2010) (noting that "causal connection between prejudice and a prohibited action . . . protects hate-crime statutes from constitutional challenge," and requiring discriminatory animus to be a but-for cause of the offense under the Iowa statute), *overruled on other grounds by State v. Hill*, 878 N.W.2d 269 (Iowa 2016); *In re M.S.*, 896 P.2d 1365, 1377 (Cal. 1995) (defining "because of" to require causation in fact and affirming constitutionality of California hate crime statute); *Hart*, 677 So. 2d at 387 (holding that under Florida statute, prejudice must "be a significant factor in bringing about the commission of the underlying crime, i.e., but for the racial enmity, the underlying crime would not have occurred" to comport with *Stalder* First Amendment analysis).

## E.     The Bias-Related Crime Act Requires But-For Causation

We are persuaded by the reasoning of *Burrage* that the Bias-Related Crime Act requires but-for causation. To find the penalty enhancement applicable to an individual accused of a crime, the government must prove that the accused would

not have committed the underlying crime but-for prejudice against the victim based on the victim's protected characteristic. Moreover, if there was genuine doubt regarding the Council's intent, the rule of lenity would counsel us to adopt a more lenient interpretation in favor of criminal defendants. *See Holloway v. United States*, 951 A.2d 59, 65 (D.C. 2008). In adopting a but-for causation standard, we do not restrict a description of such causation to the words "but for," but instead recognize that such language reflects a causation standard similar in meaning to language such as "based on," "because of," and "results from." *See Campbell v. United States*, 307 F.2d 597, 601 (D.C. Cir. 1962) (noting that the language "product of," "because of," "but for," and "result of" all articulate but-for causation). Under any such formulation, in this context, a jury is required to find that in the absence of an appellant's bias, the crime would not have occurred.

In arguing for a lesser standard, the government contends that but-for causation is misplaced when results "proceed from the contributions of many causes." But-for causation, however, is entirely consistent with a situation within which multiple causes contribute to a specific result. At its most basic level, but-for causation means "where A shoots B, who is hit and dies, we can say that A actually caused B's death, since but for A's conduct B would not have died." *Burrage*, 571 U.S. at 211 (quoting 1 W. LaFave, Substantive Criminal Law § 6.4(a), at 464-66 (2d

ed. 2003)).  However, a factor can satisfy but-for causation when it is one of multiple contributing factors; it does not have to be the largest contributing factor, but can be one factor that combines with others to produce the result.  *Burrage*, 571 U.S. at 211; *see also Bostock*, 2020 WL 3146686, at *5 ("Often, events have multiple but-for causes. . . . A defendant cannot avoid liability just by citing some *other* factor . . . . So long as the [prohibited factor] was one but-for cause . . ., that is enough to trigger the law.").  For example, if a man plagued with multiple diseases is poisoned and dies, the poison was a but-for cause of his death so long as, without the incremental effect of the poison, the man would have lived.  *Burrage*, 571 U.S. at 211.[10]  But-for

---

[10]  As we recognized in *Fleming*, and as acknowledged by the Supreme Court, the "rare" exception to the existence of but-for causation is when "multiple sufficient causes independently, but concurrently, produce a result."  224 A.3d at 222 (quoting *Burrage*, 571 U.S. at 214-15).  For example:

> "A stabs B, inflicting a fatal wound; while at the same moment X, acting independently, shoots B in the head . . . also inflicting [a fatal] wound; and B dies from the combined effects of the two wounds," A will generally be liable for homicide even though his conduct was not a but-for cause of B's death (since B would have died from X's actions in any event).

*Burrage*, 571 U.S. at 215 (quoting LaFave at 468) (alternations in original).  Although the government argues that employing a contributing cause standard would address such a situation, the Court in *Burrage* found that it would cause "confusion" to equate a situation in which there are "multiple independently sufficient causes" with a situation employing a "substantial factor" analysis.  *Id.* at 217 n.5.  In this exceptional case, neither is truly a but-for cause because the harm would have occurred regardless (due to the separate, independent causes).  Multiple,

causation, however, does not evaluate the weight of each factor; a factor is not a but-for cause merely because it contributed to a particular degree in leading to a result. *See id.* at 218. Rather, but-for causation merely determines whether a particular factor played a necessary role in leading to a particular result.

The same can be said when a result is achieved and the but-for cause, though one of multiple causes, is the most obvious or apparent factor that caused the result. In the context of murder, it is "well understood" that "a defendant's conduct that hastens the decedent's death is a but-for cause of death." *Fleming*, 224 A.3d at 222. This is true despite the fact that everyone is mortal and that death will ultimately result, regardless of whether a defendant's conduct hastens it. *Id.* Alternatively, take for example, a baseball game in which the visiting team's leadoff batter hits a home run in the first inning. *Burrage*, 571 U.S. at 211-12. If the final score is 1-0, the logical conclusion was that the victory was achieved because of the home run. *Id*. at 212. Naturally, we can say that the victory was a consequence of the home run if the victory would not have occurred absent the home run. *Id*. Importantly, *Burrage* states that "[i]t is beside the point that the victory also resulted from a host

_____

independent causes represent a narrow carve-out from but-for causation, though we need not address such a possible exception because the government has not argued that the present case calls for it.

of other necessary causes," including teamwork, skillful coaching, or favorable weather. *Id*.[11]  On the other hand, had the visiting team won 5-2, it cannot necessarily be said that the victory was owed to that single home run, mostly because it did not affect the outcome of the game but rather "merely played a nonessential contributing role in producing the event." *Id*.

Thus, to be considered a but-for cause of a result, the cause must be necessary to the result – meaning the result would not have been achieved without the cause. It does not matter if there were several other important causes; we must look at the effect the one particular cause had on the result and assess whether it may have been the "straw that broke the camel's back," *id*. at 211-12, or the tipping point leading to

_____

[11]  We also find the jury instruction's formulation of but-for causation to be similar to the Supreme Court's recent discussion of that standard as applied to Title VII:

> [A] straightforward rule emerges: An employer violates Title VII when it intentionally fires an individual employee based in part on sex.  It doesn't matter if other factors besides the plaintiff's sex contributed to the decision. . . .  If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee . . . a statutory violation has occurred.

*Bostock*, No. 17-1618, 2020 WL 3146686, at *6.

an outcome. By these analogies, we do not imply that a but-for cause be the last one, but only recognize that it must be a necessary cause – when combined with all other, potential causes – leading to the relevant result. We also acknowledge that but-for causation is not an onerous standard; it is, in fact, the minimum causation required. *See id.* at 211; *see also Crews v. United States*, 369 A.2d 1063, 1067 & n.3 (D.C. 1977) (noting the "less rigorous causal analysis of the 'but for' test").

In sum, we hold that § 22-3701(1) requires that a defendant's bias against a victim due to the victim's protected characteristic must be a but-for cause of the defendant's underlying criminal act. Bias need not be the sole cause, or even the primary cause. And it may interact with several other causes in causing the end result. For purposes of the Bias-Related Crime Act, however, bias against the victim's protected characteristic must be a but-for cause for a factfinder to find that the accused committed the underlying crime.

### III.    Standard of Review

Having found that the Bias-Related Crime Act requires but-for causation, we are now equipped to turn to the issues raised by appellants related to the penalty enhancement.

### A.    Jury Instructions

The accuracy of a jury instruction is a legal question that this court reviews de novo. *See Wash. Inv. Partners of Del. LLC v. Sec. House, K.S.C.C.*, 28 A.3d 566, 577 (D.C. 2011).  When analyzing jury instructions, the "central question for this court is whether the instruction is an adequate statement of the law, and whether it is supported by evidence in the case." *Koonce v. District of Columbia*, 111 A.3d 1009, 1022 (D.C. 2015) (brackets and citation omitted).  Here, we must assess whether the form jury instructions provided by the trial court, taken from the Criminal Jury Instructions for the District of Columbia, commonly referred to as the "Red Book," were an accurate statement of the law.[12]

### B.    Response to the Jury Note

---

[12]    While not the law, the Red Book jury instructions are "technically unofficial" form jury instructions that are "regularly updated and widely used" in the District of Columbia.  *Cousart v. United States*, 144 A.3d 27, 30 n.7 (D.C. 2016). "The instructions and accompanying extensive comments are prepared by a committee consisting of volunteer judges and experienced practitioners under the overall supervision of a law professor." *Id.*

While we review the trial court's decision on what, if any, response to give to a jury's question for abuse of discretion; the accuracy of the instruction itself is a legal question that we review de novo. *See Fleming*, 224 A.3d at 219; *Brown v. United States*, 139 A.3d 870, 875 (D.C. 2016); *Gray v. United States*, 79 A.3d 326, 337 (D.C. 2013). "[T]he trial court must give the jury an accurate and fair statement of the law." *Pannu v. Jacobson*, 909 A.2d 178, 198 (D.C. 2006). Moreover, the trial court should clear away the jury's specific difficulties "with concrete accuracy." *Gray*, 79 A.3d at 337. The jury's confusion as to an issue requires that the trial court convey "an appropriate and effective response." *Id.*

### C.    Sufficiency of the Evidence

When reviewing challenges to the sufficiency of the evidence, we "view the evidence in the light most favorable to the government, giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Cherry v. District of Columbia*, 164 A.3d 922, 929 (D.C. 2017) (citation omitted). We will affirm if, after reviewing the evidence in the light most favorable to the government, "any rational fact-finder could have found the elements of the

crime beyond a reasonable doubt." *Hernandez v. United States*, 129 A.3d 914, 918 (D.C. 2016).

## IV.    Analysis

We conclude that the trial court's instruction to the jury was a correct statement of the law, that the trial court did not abuse its discretion in reiterating that instruction in response to the jury note, and that the evidence was sufficient to support the jury's verdict.

### A.    The Jury Instruction Adequately Reflected the Requisite Causation

The trial court read to the jury the following excerpt from the Red Book instruction, using the names of appellants:

> *The elements of the offense of bias-related crime, each of which the government must prove beyond a reasonable doubt, are that Christopher [and Christina] Lucas committed a criminal act against another person –* in this case the lead charge is aggravated assault while armed – and he committed the crime of aggravated assault while armed *because of prejudice based on the actual or perceived sexual orientation of the other person. . . .*
>
> If you are not convinced the government has proven beyond a reasonable doubt the elements of a bias related

crime as that offense has been defined, you must find the defendant not guilty of this offense. *In making your determination, it does not matter if Christopher [and Christina] Lucas had additional motives for doing what he did, such as personal anger or revenge.*

*See* Criminal Jury Instructions for the District of Columbia, No. 8.104 (5th ed. 2018) (emphasis added). The comment to the instruction only states that it is "based upon D.C. Official Code § 22-3701 (2001)," which "prohibits a designated act that demonstrates prejudice." *Id.*

Through the Red Book instruction, the trial court adequately conveyed but-for causation to the jury. The first paragraph of the jury instruction explains that the jury must find that appellants assaulted Jaye "because of" prejudice based on Jaye's sexual orientation. As the Supreme Court has noted, the phrase "because of" imparts the requisite but-for causal standard. *See Burrage*, 571 U.S. at 213-14. In describing terms such as "based on" and "by reason of," the Court recognized that such language "in common talk . . . indicates a but-for relationship" and that the "but-for requirement is a part of the common understanding of cause." *Id.* at 211, 213. In *Fleming*, this court endorsed a jury instruction that used "as a result of" to describe

but-for causation. 224 A.3d at 229.[13] Recognizing this common-sense understanding, we believe it is accurate to understand "because of" as articulating but-for causation.[14] We do not read the jury instruction as applying any lesser standard.

---

[13] *Cf. E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1076 (6th Cir. 2015) (affirming jury instruction on but-for causation in Title VII retaliation case when instruction stated that "the plaintiff . . . must establish that [the claimants] were subjected to adverse employment actions by the defendant because of their internal complaints . . . ." and noting that "phrase 'because of' denotes a but-for causation relationship" (alternation in original)).

[14] The dissent is not of the opinion that "because of" can convey the nuances of but-for causation. Expressing concern that a lay jury may not be aware that "because of" has been interpreted, within the legal context, to communicate "but-for" causation. However, we establish no expectation that the jury know about the specific legal interpretation, we simply clarify that but-for causation can be articulated in the English language in more ways than through the explicit use of "but-for."

The dissent believes the example appellant Christina Lucas provides highlights that the colloquial phrase "because of" cannot adequately convey the complexities of but-for causation. The example provided–the friend going to the store because she needs milk, bread, and eggs–explicitly valuates one factor's contribution in bringing the result, specifically the need for eggs is the primary reason the friend is going to the store. As discussed, but-for causation is not a discernment of degree, it requires a determination that a particular factor was necessary to produce the result, regardless of its percentage contribution to the result or weight in relation to other causal factors. *See supra* pp. 23-24 (citing *Burrage*, 571 U.S. at 218). The initial instruction appropriately conveyed but-for causation; the criminal act was committed because of bias relating to the sexual orientation of the victim regardless of other motivating factors.

The jury was then instructed in how to evaluate bias in light of other, potential causal factors. The middle of the second paragraph made the jury aware that other motives for appellant's conduct do not, alone, negate the applicability of the bias enhancement. The instruction's explanation that "it does not matter if [appellants] had additional motives for doing what [they] did" is consistent with the language from *Burrage*, which noted that "[i]t is beside the point that [an outcome] also resulted from a host of other necessary causes." *Id*. at 212. Instead, the instruction focused the jury on bias, asking it to determine whether appellants attacked Jaye "because of" prejudice based on his sexual orientation. If the evidence showed, beyond a reasonable doubt, that appellants attacked Jaye because of his sexual orientation, then the jury could apply the penalty enhancement. Indeed, appellants do not explain how the jury could have somehow misapplied the causal element.[15]

---

[15] By using the language "because of," we conclude that the Red Book instruction articulated but-for causation. That the instruction could more clearly explicate or exemplify but-for causation, such as describing bias as a necessary causal factor or noting that jury must find that the resulting crime would not have occurred in the absence of such bias, however, does not render it an inadequate or improper statement of the law. *See Koonce*, 111 A.3d at 1022 (noting that "central question" is whether the "instruction is an adequate statement of the law"); *cf. Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 370 (D.C. 1993) ("No magic words were required so long as the instruction fairly and accurately informed the jury of the applicable law and the requirements of proof.").

**B. The Trial Court's Response to the Jury Note Adequately Cleared Away Any Potential Confusion**

We find that the trial court did not abuse its discretion in responding to the jury's note by reiterating the above jury instruction. During deliberations, the jury sent the following note: "Does prejudice based on sexual orientation need to be the only reason a crime was committed? Does prejudice based on sexual orientation need to be the primary reason a crime was committed?" After discussing the questions with counsel for both sides and over the defense counsel's objection, the trial court decided to reiterate the Red Book instruction to the jury:

> In your instructions on pages 19 and 27, . . . in making your determination it doesn't matter if Christopher or Christina Lucas had additional motives for doing what they did, such as personal anger or revenge. Your question is whether or not the government has proven beyond a reasonable doubt that the defendants acted based upon the actual or perceived sexual orientation of Jaye Davis. If the government has proven that fact beyond a reasonable doubt, then you can find that there was a bias. If they have not proven that fact beyond a reasonable doubt, then you cannot find bias, notwithstanding whatever else may have been going on.

A few hours later, the jury returned guilty verdicts on all charges. We conclude that the trial court did not err in reiterating the jury instruction in response to the jury's question.[16]

Appellants contend that the trial court's response did not adequately resolve the jury's confusion with respect to the required causation standard. First, we do not interpret the jury's note as expressing confusion about whether to apply a different or lesser standard. Such an argument is only plausible when reading "because of" as applying a standard other than but-for causation.[17] As we explained above and as

---

[16] The government contends that appellants waived their challenge by agreeing to the trial court's ultimate decision to reiterate the jury instructions, and that, even if we were to entertain appellants' challenge, "it would be reviewable at most for plain error." We disagree that appellants' challenge is waived or should be reviewed for plain error because, "consistent with the purposes of [Super. Ct. Crim. R. 30], the [trial] court had the opportunity to correct errors and omissions which otherwise might necessitate a new trial." *Preacher v. United States*, 934 A.2d 363, 369 (D.C. 2007) (internal quotation marks omitted) (holding that appellant adequately preserved his request for review when "appellant's counsel made clear the request for an instruction on assault before the jury resumed deliberations following its note specifically requesting the definition of 'assault'").

[17] Appellants maintain that the jury may have applied a "motivating factor" or "contributing factor" test, which purportedly implies a lower standard than but-for causation. Jury instructions that refer to these and other standards – such as a substantial, contributing, or motivating factor – use language to that effect and often refer to the factor as one of many that may have caused the result. *See, e.g.*, Standard Civil Jury Instructions for the District of Columbia, No. 5-13 (rev. ed. 2018) (Negligence; multiple causes) ("There may be more than one cause of harm. Several factors or circumstances, or the acts or omissions of two or more persons, may cause

discussed by the Court in *Burrage*, however, the "but-for requirement is part of the common understanding of cause"; in "common talk," phrases like "'based on' indicate a but-for causal relationship." 571 U.S. at 211, 213. There is no indication that the jury applied any standard other than but-for causation. At trial, defense counsel proposed instructing the jury using the language in *Shepherd*, which stated in *dicta* that the penalty enhancement can be applied when there is "a clear nexus between the bias identified in the statute and the assault." 905 A.2d at 262. As discussed above, our decision in *Shepherd* only found, under plain error review, that a nexus between the bias and criminal conduct was required to avoid constitutional issues. Instructing the jury to find "a clear nexus," which does not convey but-for causation, would have misstated the law and confused the jury further. Nor is there any force to the argument that using additional language proposed by appellants, like

---

the same harm. Each of the acts or omissions that played a substantial part in the harm is a cause. This is true even if one of the acts or omissions contributed more than another to causing the harm, so long as each act or omission played a substantial part in the harm."); *Sutherland*, 631 A.2d at 369 (affirming the use of the following jury instruction for a retaliation claim under the D.C. Human Rights Act: "causation means something was a substantial contributing factor. The law recognizes more than one reason for an action. You, however, determine if protected activity, that is, the discrimination claim, was a substantial contributing factor in [the] decision."); *Furline v. Morrison*, 953 A.2d 344, 350-51 (D.C. 2008) (noting that the jury instruction on a retaliation claim required that the "retributive motive 'played a substantial part in the suspension decision, even though other factors also may have motivated' the decision").

"but-for," would have provided the jury any further clarity than was provided by the use of "because of" and "based on."

Alternatively, and more importantly, appellants argue that the jury note reflected confusion about how to *apply* but-for causation, thus requiring the trial court to clear away such confusion with concrete accuracy. While we acknowledge that the jury's note expressed some confusion, we must be careful to isolate the nature of that confusion and ensure that the trial court properly responded in kind. The jury's note asked whether bias needed to be the "only" or "primary" reason for appellants' conduct. These queries sought clarification from the trial court regarding the degree to which appellants' prejudice needed to motivate Jaye's assault.

As we have discussed, but-for causation is not a discernment of degree. Rather, but-for causation determines whether a particular factor was necessary to produce a result, regardless of its percentage contribution to the result or weight in relation to other causal factors. *See, e.g.*, *Burrage*, 571 U.S. at 218 (rejecting "substantial" or "contributing" factor tests because they seek to quantify the relationship between the relevant causal factor and the end result, thereby injecting uncertainty that cannot be squared with a beyond-a-reasonable-doubt standard). Importantly, the Council rejected "primarily" as a causation standard. Responding

to the jury's questions concerning the degree to which bias motivated the assault would not have clarified any confusion about the application of but-for causation. The trial court's response, therefore, sought to steer the jury back to the critical inquiry of but-for causation.

Importantly, the trial court directed the jury to the initial instructions, which, as we explained, adequately conveyed but-for causation. The initial instruction informed the jury that it was required to find that appellants assaulted Jaye "because of" their bias, and that such determination should be made regardless of other potential motivating factors. The reinstruction also noted that it "doesn't matter if [appellants] had additional motives," reminding the jury that the relative weight of several causal factors was not determinative in assessing whether bias was a but-for cause. It then restated the relevant question as whether "the government has proven beyond a reasonable doubt that the defendants acted based upon the actual or perceived sexual orientation of Jaye Davis," i.e., because of prejudice. Turning the jury's focus to whether appellants acted "based upon" Jaye's sexual orientation correctly clarified confusion as to whether their bias was a but-for causal factor.

Referring the jury back to the original instruction was entirely appropriate in this circumstance because the instructions reflected the law. [18] *See Colbert v. United States*, 125 A.3d 326, 334-35 (D.C. 2015). In *Colbert*, the jury sent a note to the judge asking for clarification as to the elements of the crimes charged. *Id*. at 333. We held that the trial court's decision to respond to the jury by "telling the jury to re-read the elements of each offense, paying special attention" to the language "already included therein," was appropriate, particularly because the answer to the jury's question was contained therein. *Id*. at 333-34. We further held that this approach was appropriate in that context "because there is no indication in the jury

---

[18] The dissent takes the position that to clear up any jury confusion "with concrete accuracy," *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946), the trial court was required to do more than restate the instruction, proposing that "but for" should have been explicitly included in responding to the jury note. However, modifying the instruction to specifically include the words "but for" is not markedly different than the original jury instruction because but-for causation was already clearly conveyed. As discussed, the phrases "because of" and "based on" are indicative of a but-for relationship which is commonly understood as a standard for assessing causation. *See Burrage*, 571 U.S. at 211, 213-14.

As mentioned, but-for causation does not entail weighing factors, but determines if a particular factor is necessary to produce a result. *See, e.g., Burrage*, 571 U.S. at 218 (rejecting "substantial" or "contributing" factor tests because they seek to quantify the relationship between the relevant causal factor and the end result but fail to clarify how important or how substantial a cause must be). Ultimately, substituting "because of" with "but for" would not clear up the jury's confusion, it would be a recitation of the original instruction – which the trial court did, and which we conclude was the proper response to direct the jury back to applying but-for causation.

note that the jury was misinterpreting the court's instructions or was misconstruing the elements of a crime." *Id*. at 334. *Colbert* is analogous to this case, where the trial judge's decision to answer the jury's question – regarding the role that prejudice must play in appellants' motivation – by reiterating the initial instruction was correct because the answer was contained therein, which instructed the jury to determine whether appellants assaulted Jaye because of their prejudice against his sexual orientation.[19] *See also Waddington v. Sarausad*, 555 U.S. 179, 196 (2009) (concluding that the trial judge's response "directing [the jury's] attention to the precise paragraph" of the jury instructions was entirely appropriate because the instructions were "constitutionally adequate instruction" and "answer[ed] its inquiry").

We find it compelling that the jury did not request a second clarification, and there is nothing in the record to suggest that the jury did not follow instructions or that it failed to heed the trial court's direction. Where a jury asks no follow-up questions, the Supreme Court "has presumed that the jury fully understood the judge's answer and appropriately applied the jury instructions." *Id*.; *Armstrong v.*

---

[19] Courts have also held that, when neither the statute nor the case law contains a clearer answer to the jury's question, it may be entirely appropriate to repeat the jury instruction instead of attempting to give "a lengthy explanation" and possibly "confus[e] the jury." *Ware v. State*, 707 S.E.2d 111, 113 (Ga. App. Ct. 2011).

*Toler*, 24 U.S. 258, 279 (1826) (opinion of Marshall, C.J.) ("Had the jury desired further information, they might, and probably would, have signified their desire to the court. The utmost willingness was manifested to gratify them, and it may fairly be presumed that they had nothing further to ask.").  This is because, "[t]o presume otherwise would require reversal every time a jury inquires about a matter of constitutional significance, regardless of the judge's answer." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Thus, we conclude that it was not an abuse of discretion for the trial court to re-read the initial instruction, which was legally correct, to the jury to clarify any confusion as to the application of but-for causation. *See Fleming*, 224 A.3d at 219.

**C.      There Was Sufficient Evidence for the Jury to Conclude That, But-For Appellants' Bias Towards Jaye's Sexual Orientation, They Would Not Have Attacked Jaye**

On appeal, appellants argue that the evidence was insufficient to apply the bias enhancement statute because the jury could not have concluded that but-for appellants' bias against Jaye's sexual orientation the attack would not have occurred. We disagree.

The evidence at trial was sufficient for a jury to find that appellants assaulted Jaye because of his sexual orientation, even accounting for additional motives for the assault. Viewed in the light most favorable to the verdict, the evidence of appellants' bias toward Jaye – the volume and duration of homophobic taunts, the temporal proximity between the comments and the assault, and the gravity of the physical encounter was strong. *See Hernandez*, 129 A.3d at 918 (noting that we "view the evidence in the light most favorable to the verdict," "defer to the fact-finder's credibility determinations," and affirm if "any rational fact-finder could have found the elements of the crime beyond a reasonable doubt").

The jury heard testimony from Jaye, Ashley, and Alicia regarding the repeated homophobic insults that appellants spewed at Jaye from the moment he arrived at the party and during their attack on him, a time frame that exceeded four hours. Ashley testified that, when Jaye arrived at the party, both appellants stared and pointed at Jaye, and Ashley heard both of them say, "Who is this gay motherf[*]cker?" Jaye testified that he heard "f[*]ggot a[*]s mother[*]cker" at least two times when he first arrived at the party. Ashley further testified that the appellants led the group of people who targeted Jaye prior to the attack: "They were in the front, and it was then, there go that f[*]ggot mother[*]cker right there; you thought it was over." Jaye testified that right before appellants attacked him, he

heard chanting "'this f[*]ggot a[*]s mother f[*]cker' again and again" and witnessed a group of people approach him. Alicia's testimony echoed that of Jaye and Ashley.[20] These repeated homophobic remarks, which began hours before and during the assault, establish far more than "mere temporal coincidence" between the appellants' bias and the assault. *Stalder*, 630 So.2d at 1076. We conclude that such evidence was sufficient for a reasonably jury to find causation here.

The jury needed to find that, notwithstanding any additional motives like anger or revenge, appellants would not have attacked Jaye in the absence of their bias toward him based on his sexual orientation. In *Shepherd*, we focused our sufficiency holding on the temporal proximity between the bias-evidencing statement and the incident, finding clear evidence of "homophobic insults" during the assault. 905 A.2d at 263 (holding "[t]he trial court's finding of a nexus was

---

[20] Appellants attempt to distance themselves from the hateful nature of "f[*]ggot" as a homophobic slur, noting testimony from Ashley that the word can be a generic fight word used to describe a person as "weak and sensitive" and arguing that the word was used "non-literally to convey disrespect and hatred, rather than homophobia." We reject this contention. While words can have different meanings in different contexts, "f[*]ggot" can be understood to be a homophobic slur, and a jury reasonably could have concluded that appellants used it that way. *See Cherry v. United States*, 164 A.3d 922, 929 (D.C. 2017) ("[T]he government is not required to negate every possible inference of innocence." (internal quotation marks omitted)). Here, the consistent use of the term "f[*]ggot" from the moment Jaye arrived at the party through the attack belies any argument that the word was merely a neutral antagonizing word to provoke a fight.

amply supported by evidence . . . that appellant accompanied his assaults on the two women with a verbal stream of homophobic insults"). Here, we have strong evidence of homophobic taunting not only during the assault, but also in the hours prior to the assault. Because of appellants' numerous homophobic comments and the clear temporal nexus between the homophobic taunts and the attack on Jaye, the evidence was sufficient to establish but-for causation. *See State v. Duncan*, 878 N.W.2d 363, 373-74 (Neb. 2016) (concluding evidence was sufficient under hate crime statute requiring but-for causation, where defendant assaulted victim because of his belief that the victim was associated with homosexual people based on victim hearing defendant say "f[*]ggot" prior to the assault); *Hennings*, 791 N.W.2d at 835-36 (finding sufficient evidence for conviction under hate crime statute requiring but-for causation where defendant called victim "f[*]cking n[*]ggers" and hit victim with his truck); *People v. Davis*, 674 N.E.2d 895, 895, 897 (Ill. App. Ct. 1996) (affirming a conviction for aggravated battery with a hate crime penalty enhancement requiring commission of crime "by reason of" race where evidence showed that defendant targeted the victim, an African-American man, when he was walking out of a restaurant with a white male friend and yelled "N[*]gger, I am going to kick your black ass," before he beat the victim "senseless").

The severity of the attack combined with the biased statements provides further evidence of appellants' bias. *See Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 59 (D.D.C. 2019) (noting that, under the Bias-Related Crimes Act, "biased intent . . . can be inferred from circumstantial evidence, including the factual background . . . and each [d]efendants' actions," even if the plaintiffs "do not allege that [a d]efendant personally made" biased comments). The testimony established that comments concerning Jaye's sexual orientation in tones of "anger and disgust" began immediately upon his arrival to Leo's house, generally and from appellants specifically. Alicia testified that the group grabbed Jaye and dragged him to the ground while appellants "stomp[ed]" on his body and face and yelled "f[*]ggot mother[*]cker." After making these comments and stomping on Jaye's face, Christina knelt down to Jaye, took a razor-like object from her pocket, and slashed open his cheek near his left eye. She ran away immediately after, leaving him on the ground and unconscious. Appellants' conduct – following Jaye after he left the family gathering, dragging him to the ground, stomping on his body and face, slashing open his face with a razor-like object, and leaving him unconscious – constituted part of an attack during which hateful words were used to express animus toward Jaye because of his sexual orientation. The circumstantial evidence is sufficient to demonstrate that appellants attacked Jaye as a result of bias because of his sexual orientation.

The weight of the evidence of appellants' bias toward Jaye is not mitigated by the fact that Christina is a gay woman. Appellants argue that "Christina's homosexuality makes it far less likely that she targeted Jaye because he shared that attribute." Christina's counsel, in fact, made this argument to the jury – "to say that [Christina] hated someone because they were gay would be to say that she hated herself." The jury found otherwise. As appellants concede, "it is certainly possible for a gay woman to harbor prejudice against gay men." Indeed, it is well known that people can demonstrate bias and discriminate against others who fall within the same protected category as they do. *See, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78-79 (1998) (holding that Title VII of the Civil Rights Act of 1964 does not bar claims of employment discrimination based on sex merely because the plaintiff and defendant are of the same sex). In *Oncale*, the Supreme Court "rejected any conclusive presumption that an employer will not discriminate against members of his own" race or sex, *id.*, recognizing that "'[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.'" *Id.* (quoting *Castaneda v. Partida*, 430 U.S. 482, 499 (1977)). For the same reasons here, it is entirely plausible for a person to commit a bias-related crime

against another person sharing the same protected characteristic because of that characteristic.

## V. Appellants' Remaining Claims

Finally, appellants' challenge the trial court's decisions to limit certain cross-examination, to permit the government to elicit emotional testimony from Jaye's mother, and to excuse Jaye after he testified in the government's case. We review the trial judge's evidentiary decisions for abuse of discretion, deferring to the trial court when it "considers the relevance and potential prejudice of evidence." *Johnson v. United States*, 960 A.2d 281, 294 (D.C. 2008). Any issues to which appellants did not object before the trial court are reviewed for plain error. *See Lowery v. United States*, 3 A.3d 1169, 1172 (D.C. 2010).[21] We find no abuse of discretion or plain error.

---

[21] *Jones v. United States*, 127 A.3d 1173, 1187 (D.C. 2015) ("Under the plain error doctrine, appellant must establish (1) that the trial judge committed error; (2) that the error was plain, *i.e.,* clear or obvious; (3) that the error affected his substantial rights; and (4) that a failure to correct the error would seriously affect the fairness, integrity, or public reputation of judicial proceedings.").

First, the trial court did not unduly limit the defense's cross-examination of the witnesses. Appellants argue that the trial court abused its discretion by limiting cross-examination of a government witness concerning a theory of the case: that the assault was not motivated by bias, but by events earlier in the evening.[22] During Alicia's direct examination, the government only asked her about the attack that occurred outside on the corner of Sherman and Harvard streets, and did not ask her about any earlier events that occurred at Leo's house. Because of the limited scope of Alicia's direct, appellants tried, but were prohibited from, asking Alicia on cross about the events earlier in the evening.[23] When the defense attempted to ask Ashley and Jaye on cross-examination about the physical altercation at Leo's house earlier in the evening, Ashley denied witnessing a physical fight involving Jaye and Jaye denied involvement in an earlier altercation or argument. "[I]t is not improper for the trial court to limit the scope of the cross-examination to matters raised on direct-examination." *Guzman v. United States*, 769 A.2d 785, 794 (D.C. 2001). Given the

---

[22] Two weeks prior to trial, the government filed a motion *in limine* to preclude the defendants from introducing testimony about the earlier incident. The trial court granted the motion, ruling that appellants could not elicit such testimony unless it was relevant to a legally cognizable issue, e.g., to issues of identity or a theory of self-defense; in other words, appellants could not elicit such testimony to support a theory of that Jaye provoked, and thereby deserved, the assault.

[23] Despite the limited scope of direct, defense counsel attempted to ask Alicia, in a multitude of ways, about her son being involved in a fight at Leo's home earlier in the evening. On at least seven occasions, the court sustained the government's objections to the defense's questions.

limited scope of the direct examination of the witnesses, we conclude that the trial court did not abuse its discretion in limiting the scope of the witnesses' cross-examination.

Moreover, despite the appropriateness of the trial court's limitation of such cross-examination, appellants cannot convincingly argue that they were prejudiced. The defense developed its alternative theory of the case – that the attack was not motivated by bias, but by an incident that occurred earlier in the day – by calling a number of non-victim witnesses who testified regarding the earlier altercation and by discussing that confrontation during closing arguments.[24]

Second, appellants argue that the trial court abused its discretion by permitting the government to elicit emotional testimony from Alicia to improperly play to the jury's sympathy. Alicia provided emotional testimony in her direct, and the government played Alicia's 911 call at the beginning of its closing arguments.

---

[24] Over the government's objection, the trial court permitted testimony from three separate witnesses to support the defense's motive theory: (1) that Leo and another man were about to "jump" Christina outside of the party earlier in the evening; (2) that a commotion took place outside of Leo's house, and Leo and another man appeared as if they were about to fight Christina; and (3) that "the boy," Jaye, "got into it" with Christina. Then, in closing arguments, defense counsel references Jaye "going back and forth with people" and "mouthing off" earlier at Leo's house.

Because appellants only objected to one of the government's question to Alicia on direct, we review the trial court's admission of that testimony for abuse of discretion, and we review the remaining testimony and arguments for plain error. *See Johnson*, 960 A.2d at 294; *Lowery*, 3 A.3d at 1172.

While testifying, Alicia referred to her son Jaye as "my baby" and cried on the stand, stating, "I thought my baby was dead because we were shaking him and he wouldn't move. He was unconscious, but I thought he was dead." At the end of her direct testimony, the government asked Alicia to tell the jury how the incident had affected her. Then, over a defense objection as to relevance, Alicia detailed flashbacks, visits to a psychiatrist and therapist, and difficulty eating and drinking. She stated, "I can't get that vision of my baby's face being stomped on and the cutting and the bleeding and all that, I just can't get it out of my mind for nothing." The government began its closing argument by replaying Alicia's 911 call, which the defense alleges was highly emotional but contained no facts that would assist in identifying the perpetrators. In closing, the prosecution referred to the "pain in her voice" and in rebuttal, reiterated "the pain, the hurt, the emotion that Alicia Davis had when she testified."

The trial court did not err, let alone commit plain error, in permitting Alicia's emotional testimony. Alicia testified to her firsthand knowledge of the attack she witnessed, which was highly probative of the truth of the events. Appellants attacked Alicia's credibility and her ability to accurately identify the perpetrators; her emotional response was one factor that could assist the jury in weighing her credibility and truthfulness, and was therefore relevant. *See Brocksmith v. United States*, 99 A.3d 690, 697 (D.C. 2014) (noting that a "witness' demeanor on the stand . . . is of the utmost importance in the determination of credibility" (internal quotations omitted)).[25] Similarly, it was not an abuse of discretion for the trial court to permit the government during closing argument to play Alicia's 911 call or to refer to the "pain in her voice," all of which conveyed the seriousness of the assault and was another means of assessing Alicia's credibility. Further, the trial court did not abuse its discretion by allowing Alicia to testify to how the incident affected her. "[T]he government is not required to deliver a dispassionate presentation of sterile facts" particularly in cases "involving tragic death or injury" that "have an inherent

---

[25] *See also Bryant v. State*, Nos. 852, 2874, 2019 WL 5549341, at *4 (Md. Ct. Spec. App. Oct. 28, 2019) (noting that complaining witness's "testimony about the 'mixed emotions' she was experiencing during her testimony was relevant to the jury's assessment of her credibility and was admissible for that limited purpose"); *United States v. Hanrahan*, No. CR 04-1978 JB, 2005 WL 3662939, at *3 (D.N.M. Nov. 6, 2005) ("Such display of emotion and testimony go to credibility in front of the jury. Attempting to preclude witnesses from crying on the witness stand, even if possible, may limit the jury's ability to evaluate the witness' testimony.").

emotional impact." *Bost v. United States*, 178 A.3d 1156, 1202 (D.C. 2018) (quoting *Chatmon v. United States*, 801 A.2d 92, 100 (D.C. 2002)).

Third, the facts belie appellants' argument that the trial court erred in excusing complaining witness Jaye at the close of the government's case, rather than ensuring that he was available for recall in the defense's case. At the close of the government's case, the trial judge clearly communicated to Christopher's defense counsel that he could subpoena Jaye, but defense counsel stated that he was unsure whether to recall Jaye to testify about the alleged earlier fight, as the testimony would have been cumulative of what Jaye testified to in the government's case. Further, the trial court clarified with defense counsel that "I thought your defense was that ya'll wasn't even there." After consulting with Christopher, defense counsel stated that Jaye could be dismissed. We can therefore find no abuse of discretion.

## VI. Conclusion

We conclude that the trial court conveyed but-for causation when it instructed the jury that there may be "additional motives" other than bias or prejudice that caused appellants to attack Jaye, but nonetheless, the jury may convict appellants if it finds beyond a reasonable doubt that they committed the aforementioned crimes

"because of prejudice based on the actual or perceived sexual orientation of" Jaye Davis. The trial court, in responding to the jury's note requesting clarification on causation, did not abuse its discretion in directing the jury back to the original instruction. Further, the evidence was sufficient to sustain the findings that appellants attacked Jaye because of their bias toward him based on his sexual orientation. We find appellants' remaining contentions to be without merit.

*Affirmed.*

FISHER, *Senior Judge*, concurring: I agree that the original jury instructions adequately conveyed the requirement that, before appellants could receive enhanced sentences, prejudice based on the actual or perceived sexual orientation of Jaye Davis had to be a but-for cause of the assault. But the jury's note reflected uncertainty about how important that motive had to be in relation to others, and I question whether the response was sufficient to explain that, in the absence of such prejudice, the assault would not have occurred.

Defense counsel did not request such language, however. Counsel for Christina Lucas suggested that "we just direct them back to the jury instructions in regard to their, as an answer to their question." Christopher Lucas's attorney argued, "Our position basically is, as you stated, the government has to prove beyond a reasonable doubt the bias which caused the assault. . . . It's just a reasonable doubt question." The supplemental instruction accommodated both requests and easily survives plain error review.

BECKWITH, *Associate Judge*, dissenting: The deliberating jury in this case sent a note asking for guidance about how much of a role appellants' bias had to play in the assault of the complainant in order for the jury to convict them of the bias-related enhancement. Did it have to find that appellants' prejudice based on sexual orientation was "the only reason a crime was committed"? Did it have to find that it was "the primary reason a crime was committed"? The trial court answered the jury's question by reiterating the instruction on causation that it had already given the jury—a response that Chief Judge Blackburne-Rigsby concludes was sufficient to clear up any confusion the jury may have had about the causal relationship between the bias and the assault for purposes of the enhancement for bias-related crimes. *Ante* at 32-39. Unlike the Chief Judge, my concurring colleague, Judge Fisher, "question[s] whether the response was sufficient to explain that, in the absence of such prejudice, the assault would not have occurred." *Ante* at 53. Judge Fisher nevertheless rejects appellants' claim of instructional error on plain error grounds based on his view that the appellants' objection was inadequate to preserve the challenge.

While I agree with Chief Judge Blackburne-Rigsby that the appellants preserved their challenge to the trial court's response to the jury question,[1] *ante* at 32 n.15, and I agree with both of my colleagues that the Bias-Related Crime Act requires the government to establish that the accused would not have committed the underlying crime but for the accused's prejudice against the complainant's protected characteristic, *ante* at 21-26, I respectfully dissent from Chief Judge Blackburne-Rigsby's conclusion that the trial court adequately dispelled the jury's confusion by repeating its prior instruction.

---

[1] *See Zeledon v. United States*, 770 A.2d 972, 975 (D.C. 2001); *Whitaker v. United States*, 617 A.2d 499, 508 (D.C. 1992) (noting that even an inaccurate or unclear request for instruction may be sufficient if it "directed the mind to the legal principle, and . . . required that a correct instruction be given with regard thereto"). Judge Fisher's description of the extensive discussion of the jury note is a simplification that leaves out several key facts relevant to whether appellants preserved their objection, including that the discussion took several turns as the parties considered the options; that one appellant mentioned the need for a "[v]ery clear nexus between the bias identified in the statute and the assault finding" and the need for clarity "that it was the bias that was the source of the assault;" that the prosecutor urged the court to answer the jury's specific question; that the court expressed its disinclination to instruct the jury about whether bias had to be the only or the primary reason a crime was committed; and that the judge made a decision so we have a ruling to review. As in *Zeledon*, the trial court's failure to reinstruct the jury accurately did not stem from the content of appellants' suggestions "but from her belief that no instruction was necessary." 770 A.2d at 976. "[T]he plain error rule is not meant to be punitive; instead its purpose is to allow the trial judge [to] fully . . . consider issues and thereby avoid potential error." *Williams v. United States*, 966 A.2d 844, 847 (D.C. 2009) (internal quotation marks and citation omitted). The trial court here had every opportunity to avoid error.

As Judge Fisher points out in concurrence, the jury's question reflected its uncertainty about what role bias played and "how important that motive had to be in relation to others" in its determination of appellants' guilt under the BRCA. The right answer to the jury's inquiry, as the court holds today, was that prejudice had to be a but-for cause of the crime. Yet instead of addressing the uncertainty directly—and heeding the prosecutor's assertion that it was "important that the Court at least respond to the specific question"—the court, stating that "[t]here's no case law addressing that point specifically" and that it "honestly [didn't] know" whether bias "has to be the only reason," fell back on the instruction that caused the jury to seek guidance in the first place. Even assuming the initial instruction fully conveyed the bias enhancement's but-for causation requirement,[2] the jury didn't grasp it, and once

---

[2]    I disagree with the majority that the original instruction adequately conveyed the concept of but-for causation to the jury—in particular, the court's conclusion that, because the phrase "because of" has been interpreted to signify "but-for" causation in statutes, a lay jury would interpret "because of" in a jury instruction to convey the same meaning. *Ante* at 29-31. The jurors' expressed confusion about the jury instruction in this case demonstrates that the colloquial use of the phrase "because of" does not necessarily convey the nuances of a complicated legal concept. Christina Lucas illustrates this well with the example in her supplemental brief about the friend who tells you she is going to the store because she needs milk, bread, and eggs. Without further information, nothing about that statement indicates that each of those three products is a but-for cause of her trip. If you gave your friend a dozen eggs, she might still go to the store to buy milk and bread, or she might not, because the eggs were in fact the but-for cause of her trip and she could wait until later to pick up milk and bread. In sum, as Ms. Lucas states in her brief, the "demand for but-for causality in the criminal law does not perfectly align with everyday speech."

the jury sought clarity regarding a controlling issue in the case, the court was required to clear it up "with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946). I would hold that the trial court failed to do so, that it affected the verdict, and that the bias enhancements should be reversed.